ace

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MOHAMMAD MANSOORI,     )
     )
     **Plaintiff,**     )
     )
**vs.**     )
     )     **Case No. 04-3241-JAR**
**HARLEY G. LAPPIN, et al.,**     )
     )
     **Defendants.**     )
_____)

### MEMORANDUM AND ORDER GRANTING DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

Plaintiff, a *pro se* litigant, filed a complaint on August 4, 2004, against Harley G. Lappin,

the Director of the Bureau of Prisons ("BOP"), as well as a number of other officials and

personnel at the BOP and at United States Penitentiary ("USP") Leavenworth.[1]  In this civil

rights action, plaintiff brings a claim under *Bivens v. Six Unknown Named Agents of Federal*

*Bureau of Narcotics*,[2] for violation of his Eighth Amendment rights during his incarceration in

federal prison.  From January 15, 2003 to July 11, 2003, plaintiff alleges, he was assaulted by the

---

[1]Plaintiff originally filed suit against the following defendants: Harley Lappin, Kathleen Hawk-Sawyer, Harrell Watts, G.L. Hershberger, Eddie J. Gallegos, William B. McCollum, Brian R. Jett, Rick Veach, Helen Marberry, Daniel A. Nitchals, Eric Wilson, William Howell, Jr., Robert Bennett, Mark Sedillo, Gloria Buser, R.D. Swanson, the Estate of N. Lee Conner, John Doe One and Federal Bureau of Prisons Inmate Trust Fund.  In a Memorandum and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (Doc. 57), this Court dismissed defendants Lappin, Hawk-Sawyer and Watts for lack of personal jurisdiction.  The Court also dismissed defendant Federal Bureau of Prisons Inmate Trust Fund for lack of subject matter jurisdiction.  Further, the Court found that because plaintiff had failed to effectuate service to defendants Hershberger, Estate of N. Lee Connor, Marberry, Nitchals, Wilson and John Doe, these defendants were entitled to dismissal without prejudice.  Therefore, the remaining defendants in this action, who are moving for summary judgment, include: Gallegos, McCollum, Jett Veach, Howell, Bennett, Sedillo, Buser and Swanson.

[2]403 U.S. 388 (1971).

environmental tobacco smoke ("ETS") at USP Leavenworth from other inmates' and BOP staff's cigarettes, thereby subjecting him to cruel and unusual punishment in violation of the Eighth Amendment.  Plaintiff claims that he is a chronic asthma sufferer and cardiac patient whose symptoms have been exacerbated by defendants' failure to prevent his exposure to ETS.  Plaintiff contends that each defendant knew of plaintiff's asthma and heart conditions, and that their practice of forcing him to breathe ETS caused an excessive risk to plaintiff's health and safety and resulted in chronic and substantial pain for plaintiff.  Plaintiff seeks $1,000,000 in actual damages against each defendant and $5,000,000 in punitive damages against each defendant for these alleged violations of his constitutional rights.

Defendants have filed a Motion for Summary Judgment on plaintiff's claims (Doc. 75).  Plaintiff filed a response, and defendants filed a reply.  Plaintiff filed another response, essentially a surreply, and defendants filed a Motion to Strike Surreply (Doc. 85).  For the reasons contained herein, the Court grants defendants' motions.

## I.      Motion to Strike Surreply

Plaintiff filed a second response titled "Plaintiff's Response to Defendants [sic] Motion 'Reply in Support of Defendant's [sic] Motion for Summary Judgment,'" which in effect is a surreply.  Defendants then filed a motion asking the Court to disregard the surreply because it was filed without leave of court.  Under D. Kan. R. 7.1(a) and (c), parties are permitted to file a dispositive motion, a response and a reply.  "Surreplies are typically not allowed."[3]  "Surreplies

---

[3]*Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004) (citing *Metzger v. City of Leawood*, 144 F. Supp. 2d 1225, 1266 (D. Kan. 2001)).

are permitted in rare cases but not without leave of court."[4]  A court will grant leave to file a surreply "for rare circumstances as 'where a movant improperly raises new arguments in a reply.'"[5]

Because plaintiff is a *pro se* litigant, the Court must construe his pleadings liberally and apply a less stringent standard than that which is applicable to attorneys.[6]  But the Tenth Circuit "'has repeatedly insisted that *pro se* parties follow the same rules of procedure that govern other litigants.'"[7]  While courts "make some allowances for 'the [*pro se*] plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements [,]' the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record."[8]

In this case, plaintiff has not sought leave to file a surreply.  Further, he fails to provide to the Court some rare circumstance that would justify granting leave to file a surreply, such as defendants improperly raising a new issue in their reply.  Therefore, the Court grants defendants' motion to strike plaintiff's surreply.  Although the Court will not consider plaintiff's surreply in the summary judgment analysis below, the Court nevertheless has reviewed plaintiff's improper

---

[4]*Id.* (citing *Humphries v. Williams Natural Gas Co.*, No. 96-4196, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998)).

[5]*McShares, Inc. v. Barry*, 979 F. Supp. 1338, 1341 (D. Kan. 1997) (quoting *E.E.O.C. v. Int'l Paper Co.*, No. 91-2017, 1992 WL 370850, at *10 (D. Kan. Oct. 28, 1992)).

[6]*Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997).

[7]*Garrett v. Selby, Connor, Maddux & Janner*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994)).

[8]*Id.* (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).

submission and has determined that it contains nothing that would alter the outcome.  The Court would reach the same result on defendants' summary judgment motion regardless of its consideration of the arguments in plaintiff's surreply.

## II.      Uncontroverted Facts

Pursuant to D. Kan. R. 56.1(a), "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."  In his response to defendants' motion, plaintiff fails to controvert defendants' statement of facts in accordance with this rule. Defendants even attached a copy of D. Kan. R. 56.1 to its summary judgment motion[9] in order to provide plaintiff with the requirements of this rule, but plaintiff nevertheless failed to follow the appropriate procedure.  Throughout his response, plaintiff states his objections to certain paragraphs in defendants' statement of facts.[10]  However, plaintiff fails to provide authenticated, supporting documents as evidence of controverted facts as required by Rule 56.1.[11]  Even if the documents attached to plaintiff's response were authenticated, none of the evidence proffered in these exhibits provides any materially conflicting evidence.[12]

---

[9](Doc. 76, Ex. 16.)

[10]Specially, plaintiff objects to paragraphs 4, 8, 11, 13, 15–18, 23, 27, 36, 54, 56, and 57 from defendants' statement of facts.

[11]*See* D. Kan. R. 56.1(d) ("All facts on which a motion or opposition is based shall be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answer to interrogatories and responses to requests for admissions.").

[12]Plaintiff has attached seven exhibits to his response: a grievance form addressed to William Howell and filled out by plaintiff in which he complains of ETS exposure (Doc. 82, Ex. 1); a grievance form addressed to Helen Marberry and filled out by plaintiff in which he requests that he be moved to a nonsmoking unit and he alleges that prison officials have retaliated against him by exposing him to ETS (*Id.*, Ex. 2); a letter from Warden N. Lee Connor to Senator Sam Brownback addressing complaints that plaintiff made to the Senator and describing the smoking policy at the prison and the prison's accommodation of plaintiff's requests for a nonsmoking environment (*Id.*, Ex.

As Judge Crow stated in *Beams v. Norton*,[13] "the non-movant's duty to admit or deny allegations of fact is a well-established procedural rule in Fed. R. Civ. P. 56 and is not too complex for a *pro se* litigant to understand and follow." However, this failure to comply with this well-established procedural rule does not alone make summary judgment proper, for plaintiff's burden to respond arises only if the motion is properly supported in the first instance.[14] "Accordingly, summary judgment is 'appropriate' under Rule 56(e) only when the moving party has met its initial burden of production under Rule 56(c)."[15] If the evidence presented by the moving party does not satisfy this burden, "summary judgment must be denied *even if no opposing evidentiary matter is presented*."[16] Thus, if a nonmoving party fails to properly respond to a motion for summary judgment, the court must first examine the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and that the moving party is entitled to judgment as a matter of law. Having made this examination, this Court finds that defendants have properly supported their assertions of uncontroverted facts, in accordance with Fed. R. Civ. P. 56. Thus, this Court considers

---

3); a letter written by plaintiff to the Director of the BOP complaining of ETS (*Id.*, Ex. 4); a memorandum written by Robert Bennett, Unit Manager of C-Cell House at USP Leavenworth, describing the smoking policy and the resulting discipline for violating the policy (*Id.*, Ex. 5); medical forms and work classification status forms from USP Leavenworth and Metropolitan Correctional Center in Chicago dated outside of the time periods relevant to this action and indicating that plaintiff should be placed in a smoke free environment (*Id.*, Ex. 6); and a "fact sheet" from the National Center for Chronic Disease Prevention and Health Promotion describing the effects of ETS exposure (*Id.*, Ex. 7). None of these documents controvert any of the material evidence submitted by defendants because they contain no evidence that plaintiff was exposed to unreasonably high levels of ETS or that defendants acted with deliberate indifference to plaintiff's ETS exposure.

[13]256 F. Supp. 2d 1203, 1206 (D. Kan. 2003), *aff'd*, 93 Fed. Appx. 211 (10th Cir. 2004) (unpublished).

[14]*Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).

[15]*Id.* at 1194.

[16]*Id.*

defendants' statement of facts uncontroverted.

During the time periods relevant to this action, plaintiff was housed in the C-2 Cell House Unit at USP Leavenworth.  The C-2 Cell House Unit was designated as a non-smoking unit, but this designation was altered in January 2003 when additional inmates were moved to the C-2 Cell House Unit to accommodate renovations in other cell houses.  From January through July 2003, the C-1 and C-2 Cell House Units operated under a limited smoking policy in which inmates were permitted to smoke only in their individual cells and only with the cell doors shut.  The inmate population was advised of this policy change, and were warned of the potential discipline which might result from smoking in unauthorized areas.  In July 2003, the C-1 and C-2 Cell House Units returned to a non-smoking unit.

Starting in 1986, the BOP implemented various policies to address the issue of inmate smoking including designating smoking and nonsmoking areas within its facilities to limit exposure to ETS.  In 1990, the BOP instituted a policy to limit smoking areas to the minimum number possible, consistent with effective operations, and specifically prohibited smoking in certain areas.  In 1994, the BOP amended the policy, designating all areas of its institutions as nonsmoking unless specifically identified by the Warden and giving the Warden discretion to limit indoor smoking areas.  In July 2004, the BOP again changed its policy, allowing the Warden to entirely eliminate smoking areas within prisons.  Under this new policy, the Warden of USP Leavenworth discontinued the sale of cigarettes in the commissary and designated the prison a smoke free institution in November 2004.

Robert Bennett was the Unit Manager for the C-1 and C-2 Cell House Units from April 2002 through July 2003, when the cell house operated under a limited smoking policy to

accommodate the excess prisoners housed in that unit.  Unit Manager Bennett advised the inmate

population of this limited policy that permitted inmates to smoke only in their individual cells

and only with the cell doors shut.  Unit Manager Bennett posted a memorandum to the inmate

population describing this smoking policy and warning that violation of the policy would result

in discipline, such as the removal of phone, commissary, and visiting privileges for up to 90

days.  During this time period, Unit Manager Bennett strictly enforced the smoking policy, and

he worked to ensure that the nonsmoking inmates were placed with a nonsmoking roommate.

Plaintiff made complaints to Unit Manager Bennett regarding ETS, and United Manager Bennett

attempted to work with plaintiff to ensure that he was not placed with a smoking roommate, to

identify and discipline inmates smoking in unauthorized areas, and to limit the impact of the unit

temporarily being designated with limited smoking areas.

        The air ventilation system at USP Leavenworth circulates a certain percentage of outside

air to the individual cells.  American Correctional Association ("ACA") standards provide

specific guidelines for air ventilation in inmate housing units.  Under ACA standards 4-4151 and

4-4152, indoor air quality must be at least 15 cubic feet of outside or recirculated filtered air per

minute per occupant of the rooms, officer stations, and dining areas, as documented by an

independent, qualified source for new construction and circulation for existing structures.  Since

1999, USP Leavenworth has been accredited by the ACA, and found to be in compliance with its

standards for air quality.  In October 1999, an inspection of the C Cell House Units indicated at

least 30–98 cubic feet of outside air being circulated in the inmate cells.  USP Leavenworth was

inspected again in August 2003 and found to be compliance with ACA standards.

        In a grievance dated January 28, 2003, plaintiff complained that he was moved from a

nonsmoking unit and placed in a cell with a smoker.  Plaintiff also objected to the memorandum

issued by Unit Manager Bennett describing the limited smoking policy because plaintiff believed

this policy was in violation of a BOP policy mandating smoke free housing.  By posting this

memorandum, plaintiff alleged that Unit Manager Bennett was willfully and deliberately

indifferent to plaintiff's health.  Plaintiff asked that all smokers be removed from the C-1 and C-

2 Cell House Units, that the commissary be prohibited from selling all tobacco products, and that

anyone possessing tobacco products in their cells in the C Cell House Units be transferred to

another unit.  On February 5, 2003, Warden N. Lee Connor responded to plaintiff's complaints

by explaining that when the unit manager interviewed plaintiff on January 31, 2003, plaintiff

stated that his cell mate does not smoke in the cell.  Further, plaintiff's cell mate was advised that

he cannot smoke in the cell.  Additionally, Warden Connor noted that the prison staff makes

every attempt to place inmates who are compatible in the same cell and that the C Cell House

Unit had designated nonsmoking floors.

　　　Plaintiff appealed Warden Connor's decision to G.L. Hershberger, Regional Director of

the BOP, on February 13, 2003.  In his appeal, plaintiff complained that he was placed in a unit

with a large number of inmates who smoked and that he was assigned a cell mate who began

smoking so much that plaintiff suffered a "reaction/heart attack" and had to be taken to the

hospital.  Plaintiff alleged that there was so much smoke in the unit that he suffered "nausea,

headaches, chest pains, difficulty in breathing, and numerous other symptoms of exposure to

second hand smoke."  Plaintiff again asserted that Unit Manager Bennett, by posting the

memorandum describing the smoking policy, violated a BOP policy that requires smoke free

housing to inmates.

On March 10, 2003, Regional Director Hershberger denied plaintiff's appeal stating that the assignment of smoking inmates to the C Cell House Units was a temporary measure designed to accommodate renovations and that smoking was prohibited outside of designated areas in the C Cell House Units.  Further, he stated that inmates who are observed smoking outside of the designated areas will receive disciplinary action.  Regional Director Hershberger also informed plaintiff that measures were being taken to ensure that to the extent practicable, nonsmoking inmates were being housed separately from smoking inmates and that, upon notification to prison officials, accommodations would be made to separately house smoking and nonsmoking inmates.  Additionally, Regional Director Hershberger stated that the temporary modification of the smoking policy in the C Cell House Units was warranted by the renovation project and meets the requirements of BOP policy.

Plaintiff appealed Regional Director Hershberger's denial on April 1, 2003, to Harrell Watts, Administrator of National Inmate Appeals for the BOP.  Administrator Watts denied plaintiff's appeal stating that under BOP policy, all areas are nonsmoking unless specifically designated as a smoking area by the Warden.  He explained that because of the renovations at USP Leavenworth, inmates were allowed to smoke inside their closed cells but smoking outside of these designated areas was prohibited and inmates who violated this smoking policy were subject to discipline.  Further, Administrator Watts advised plaintiff that upon notification, the prison would make accommodations to separately house smoking and nonsmoking inmates.

Plaintiff has a history of diabetes, asthma, and cardiac conditions, including cardiac arrhythmia (irregular heartbeat), mild hypertension (high blood pressure), sinus arrest (slow heart rhythm due to an abnormal sinus node, generally treated with a pacemaker), and syncope

(fainting).  Plaintiff has long-standing asthmatic and heart conditions that were in existence prior to his incarceration.  Plaintiff has reported that he has experienced asthma since his childhood. During the plaintiff's periods of incarceration at USP Leavenworth, he was seen numerous times by a physician and physician assistants.  Because of plaintiff's diabetes, cardiac, and pulmonary conditions, he was placed in the Chronic Care Clinic ("CCC"), which provides for a more frequent evaluation of plaintiff's conditions that are chronic in nature, and for his need to be evaluated for potential changes during incarceration.

On December 2, 1999, plaintiff was evaluated by medical staff at USP Leavenworth, and he was diagnosed with subclinical asthma, a mild asthma that does not show obvious symptoms. Plaintiff reported a history of asthma since childhood, that he experienced trouble breathing around cigarette smoke, but he was not aware of any wheezing.  During this evaluation, plaintiff's lungs were clear to auscultation, with no audible wheezing noted, but a mildly prolonged expiration phase.  Plaintiff's oxygen saturation level, the measure of the oxygen level in the blood, was between 94–98% (mostly 95–96% on  room air).  Plaintiff's peak flow levels, which measure how well a person breathes, were in the normal range (470/480/425).  Based on these evaluations, the medical staff determined that plaintiff probably had subclinical asthma, and prescribed an oral metered dose inhaler, Albuterol, to be used as needed for troubled breathing.  Plaintiff was also advised to return to the clinic in January 2000 for further review.

On January 13, 2000, plaintiff was again seen by medical staff at USP Leavenworth. During this appointment, plaintiff requesting smoke free housing and reported that he had a long history of intolerance to smoke, had a tight chest, red eyes and congested nose.  Plaintiff's peak flows were again measured, and were again found to be within normal limits (385/435/375/485).

Plaintiff also had normal blood pressure and pulse, and his oxygenation levels improved from the previous month's testing to 96–97% on room air.  Plaintiff's lungs also revealed no audible wheezes.  Plaintiff was diagnosed with probable (presumptive) subclinical asthma, with a long history and increased in smoke-filled environment.  It was determined that plaintiff would benefit from a smoke free environment, and a permit to this effect was written.  While plaintiff was noted to benefit from a smoke free housing environment, his clinical assessment revealed no impact of second-hand smoke.

Dr. McCollum has determined that plaintiff's cardiac condition appears unrelated to ETS based on his medical history.  In May 2000, plaintiff experienced mild chest pain during a fistula repair.  He was transferred to the United States Medical Center for Federal Prisoners at Springfield, Missouri ("USMCFP Springfield") from May 18, 2000 to September 15, 2000, for further assessment of his cardiac arrhythmia because he experienced sinus arrest after minor surgery and he had a history of fainting spells.  Plaintiff's condition was evaluated for potential sick sinus syndrome—problems with the sinus node of the heart which is the body's natural pacemaker.

While at USMCFP Springfield, plaintiff was seen by a cardiologist who recommended an electrophysiologic study for plaintiff with consideration for a pacemaker.  Plaintiff initially stated that he would consider the study, but ultimately changed his mind and refused the study and the pacemaker.  Also during his stay at USMCFP Springfield, plaintiff was referred for psychological consultation for assessment of potential anxiety difficulties.  During this consultation, plaintiff stated that he was physically healthy through his life until 1988 when he began having heart difficulties.

Upon the plaintiff's return to USP Leavenworth, he experienced two additional fainting episodes and some chest pain.  Plaintiff was referred to USMCFP Springfield for further evaluation in April 2001, and he was referred again for a pacemaker implant.  At USP Leavenworth, plaintiff's conditions continued to be evaluated in the CCC, including his diabetes and his cardiac and asthma conditions.  On February 26, 2002, plaintiff noted he was doing well, and his tests for blood pressure, pulse and oxygenation levels were within normal ranges.

On October 3, 2002, plaintiff was evaluated at the Metropolitan Correctional Center in Chicago, Illinois ("MCC Chicago"), where again, his peak flow, blood pressure and pulse were all within normal ranges, and his heart rate was regular in rate and rhythm.  Plaintiff was continued on his medications, given a cardiac diet, and added to the CCC for MCC Chicago.  On December 5, 2002, plaintiff was seen again in USP Leavenworth's CCC where plaintiff noted he was feeling well.  The medical staff reported that plaintiff looked healthy and that his lungs were clear.  Plaintiff's current medications were continued and he was advised to return to the CCC within ten weeks.  On December 13, 2002, plaintiff was examined by the medical staff of the CCC at USP Leavenworth for a diabetic foot check and peak flows.  Plaintiff's peak flows at that time were within normal range (420/430/470).

On January 16, 2003, plaintiff was taken to the emergency room of Cushing Memorial Hospital, after complaining of chest plain.  A nurse at the prison felt he should be seen despite plaintiff's long history of non-cardiac chest pain.  Plaintiff's chest was noted to be clear and equal bilaterally and his cardiovascular system was noted to be regular.  His condition appeared to resolve itself, and his chest examination was unremarkable.  It was noted that his lungs were well expanded and free of infiltrate.  Plaintiff's heart and mediastinum were unremarkable.

12

Plaintiff was examined on February 18, 2003 at USP Leavenworth.  At that time, plaintiff reported he was feeling okay except that he was housed with a cell mate who was smoking in the cell and he stated that the smoking affected his breathing.  Another medical examination of plaintiff on February 28, 2003 at USP Leavenworth revealed that plaintiff was feeling fine except some nonspecific aches and pains, especially in his calves and fingers since increasing his statin medications.  On April 29, 2003, plaintiff received another medical examination at the CCC at USP Leavenworth.  Plaintiff reported feeling good overall, and that he walked about three hours a day.  His oxygen saturation level was 97% at room air.  His peak flows were again within normal ranges (460/480/420).  His lungs were clear and his heart was regular in rate and rhythm without murmurs.

On June 13, 2003, at FTC Oklahoma City, Oklahoma, plaintiff stated during a medical examination that he had a history of asthma and uses an Albuterol inhaler as needed.  Plaintiff denied any current problems.  His lungs were again clear.  A medical examination of plaintiff on August 29, 2003 at MCC Chicago revealed that plaintiff's lungs were clear without rales and without wheezes.  His oxygen saturation level was 97%.  On October 7, 2003, plaintiff was examined again at MCC Chicago by medical staff who found his lungs were clear in all fields and his heart was regular in rate and rhythm without murmurs.  Plaintiff was again examined on January 14, 2004 at MCC Chicago.  Plaintiff complained of difficulty breathing because he claimed that he ran out of his Ventolin inhaler.  Plaintiff's breathing was noted to be fast and shallow, but without episodes of coughing.  His lungs were clear bilaterally to auscultation and his heart was regular in rate and rhythm without murmurs.

On January 19, 2004, at MCC Chicago, plaintiff reported that he had chest pain.  During

13

an examination, plaintiff was observed without signs of distress upon exertion, shortness of

breath or clutching his chest.  His peak flow was relatively lower than his normal range at 300.

It was determined that plaintiff's chest pain was non-cardiac in origin, and possibly acid reflux.

On January 26, 2004, at MCC Chicago, plaintiff reported being out of his Albuterol inhaler.  It

was noted that plaintiff had a history of asthma that was mild/inactive.  Plaintiff was last

prescribed Albuterol on June 20, 2003.

On June 25, 2004, plaintiff was examined by medical staff at the CCC at USP

Leavenworth who found plaintiff's lungs were clear, his oxygen saturation level was 98%, and

his heart was regular in rate and rhythm.  Plaintiff was seen in the CCC at USP Leavenworth

again on December 3, 2004 regarding his cardiac condition and hypertension.  His lungs were

clear to auscultation.  His heart was regular in rate and rhythm, and his oxygen saturation level

was 98%.  On February 24, 2005, plaintiff was examined at the CCC at USP Leavenworth

regarding his cardiac condition and hypertension.  He reported that he was doing "okay" and that

he walked daily.  His lungs were clear and his heart was regular in rate and rhythm.  His oxygen

saturation level was 98%.  On May 5, 2005, plaintiff reported to the medical department at USP

Leavenworth that his chest was hurting.  He was in no apparent distress.  His lungs were clear to

auscultation.  His heart was regular in rate and rhythm with no sinus rhythm.  His oxygen

saturation level was 97%.  Plaintiff reported that his pain level was 2 on a 1-to-10 scale with no

radiating pain.  On June 30, 2005, plaintiff was again examined and voiced no complaints at that

time.  He did not have chest pain, and his lungs were clear to auscultation, without rales or

wheezes.

On November 4, 2005, plaintiff sent an Informal Request to Staff Member, commonly

referred to as a cop-out, to the MCC Chicago Health Services Department regarding his heart and lung situation.  The medical staff advised plaintiff his condition would be reviewed at his next CCC appointment.  Plaintiff was examined at MCC Chicago on December 21, 2005.  At that time, he denied chest pain and assessed his pain at zero.  Plaintiff's oxygen saturation level was 98%.  His heart was regular in rate and rhythm without murmurs.  Plaintiff's lungs were clear without rales or wheezes.  The assessment was that plaintiff's hypertension (high blood pressure) was controlled.  It was noted that plaintiff had a history of cardiac arrhythmia and that he was at risk for coronary artery disease.  Plaintiff was scheduled for a follow-up appointment in six months.

Since his December 21, 2005 medical examination, plaintiff's medical records reveal that his medical care and treatment have consisted primarily of an optometry examination on January 31, 2006, requests for, and appointments with, the Chief Dental Officer concerning a sore tooth, and requests concerning the expiration of his permit for his special shoe.  Plaintiff's medical conditions were appropriately treated by staff, including his asthma.

Dr. McCollum reports that plaintiff's chronic asthma condition remained relatively stable throughout his entire incarceration at USP Leavenworth, as evidenced by his unchanging oxygen saturation levels and peak flow levels.  Dr. Collum has determined that plaintiff's cardiac conditions were unchanged by his exposure, if any, to ETS.  He further states that there is nothing clinically indicating plaintiff's asthma, cardiac or diabetic conditions, were caused or aggravated by ETS.  Dr. McCollum maintains that plaintiff's health conditions have remained relatively stable throughout his incarceration.

**III.    Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[17]  A fact is only material under this standard if a dispute over it would effect the outcome of the suit.[18]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[19]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[20]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[21]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[22]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[23]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[24] When examining the

---

[17]Fed. R. Civ. P. 56(c).

[18]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[19]*Id.*

[20]*Id.* at 251–52.

[21]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[22]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325)).

[23]*Id.*

[24]*Id.*

underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[25]   As stated above, the Court must construe *pro se* pleadings liberally and apply a less stringent standard than that which is applicable to attorneys.[26]   However, the Court may not provide additional factual allegations "to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[27]   The Court need only accept as true plaintiff's "well-pleaded factual contentions, not his conclusory allegations."[28]

## IV.   Discussion

Previously in this action, in a Memorandum and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, this Court dismissed all of plaintiff's claims asserted against defendants in their official capacities.[29]   Therefore, only plaintiff's individual capacity claims remain in this *Bivens* action.   Under *Bivens*, federal officials may be individually liable for constitutional violations performed under color of federal authority.[30]   However, qualified immunity is a defense to a *Bivens* action.[31]   In their motion for summary judgment, defendants contend that they are entitled to qualified immunity.   Upon a defendant's assertion of a qualified

---

[25]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[26]*Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997).

[27]*Id.*

[28]*Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[29](Doc. 57 at 6–8.)

[30]*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 391 (1971) (concluding that federal agents may be held individually liable for Fourth Amendment violations).

[31]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

immunity defense in a summary judgment motion, plaintiff has a two-part burden.  First, plaintiff must come forward with facts or allegations that the defendant's conduct was a violation of a clearly established constitutional or statutory right at the time of its occurrence, and second, plaintiff must show that the violated right was "clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right."[32]  The issue of immunity is a legal one and the Court may not avoid it by framing it as a factual issue.[33]  The Supreme Court counsels that before addressing the issue of qualified immunity, the Court must first consider: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[34]      In this case, plaintiff alleges that he was assaulted by ETS at USP Leavenworth from other inmates' and BOP staff's cigarettes, thereby subjecting him to cruel and unusual punishment in violation of the Eighth Amendment.  In *Helling v. McKinney*,[35] the Supreme Court concluded that exposing a prison inmate to ETS can violate a prisoner's right to be free from cruel and unusual punishment under the Eighth Amendment.[36]  A prisoner may establish a claim under the Eighth Amendment for compensatory relief by alleging that prison officials "have with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health."[37]  To

---

[32]*Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997); *see Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).

[33]*Id.* at 1347.

[34]*Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005).

[35]509 U.S. 25 (1993).

[36]*Id.* at 35.

[37]*Id.*

determine whether prison officials have violated a prisoner's Eighth Amendment rights, a prisoner must satisfy a two-part test consisting of an objective and subjective prong.[38]  The objective prong requires the prisoner to show that he is "being exposed to unreasonably high levels of ETS."[39]  Additionally, the court must assess "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwilling to such a risk."[40]  The subjective prong requires the prisoner to show that the defendants were deliberately indifferent to the hazards of exposing plaintiff to ETS "determined in light of the prison authorities' current attitudes and conduct."[41]

### A.      Unreasonably High Levels of ETS

Plaintiff complains that he has a right to a smoke free environment and that defendants ignored his requests for smoke free housing.  However, under constitutional law, plaintiff is "not entitled to a completely smoke-free correctional facility."[42]  Rather, under *Helling*, plaintiff must show that he was exposed to unreasonably high levels of ETS.[43]  Even when viewing all of the evidence in the light most favorable to plaintiff, he has failed to make this showing.

While plaintiff complains that he was housed in a room with a smoker and that there was so much smoke in his Cell House Unit and his individual cell that he suffered nausea, headaches,

---

[38]*Id.*

[39]*Id.*

[40]*Id.* at 36.

[41]*Id.*

[42]*Barry v. Wilson*, 91 F.3d 159, 1996 WL 366217, at *2 (10th Cir. July 2, 1996) (unpublished table opinion).

[43]*Helling*, 509 U.S. at 35.

chest pain, difficulty breathing and numerous other symptoms of exposure to ETS, he provides

no evidence, other than his allegations, of the level of ETS.[44]  Moreover, plaintiff has not

demonstrated that the levels of ETS to which he was exposed were unreasonable.  In his

response, plaintiff even "stipulates to the defendant's counsel that he has not provided any

'evidence' of his claim" to establish the amount of ETS to which he was exposed.[45]  Plaintiff

complains that he does not have access to "monitoring equipment" to determine the levels of

ETS in his cell, but plaintiff has failed to gather evidence of the level of ETS through other

methods of discovery to support his claim.

For example, in response to defendants' interrogatory asking plaintiff to identify all

evidence that he intends to offer in support of his claim that he was subjected to unreasonably

high levels of ETS at USP Leavenworth during the relevant time period, plaintiff stated that

"[t]he commissary record will show that over 1 million cigarettes was [sic] sold every month at

USP Leavenworth and [the] blueprint for [the] ventilation system will show that air at USP

Leavenworth just keep [sic] circulating inside the cells."[46]  Plaintiff has not provided the Court

with this evidence.  But even if he had, this evidence would be insufficient to establish plaintiff's

claim.  Despite plaintiff's claim that the commissary at USP Leavenworth sold over one million

cigarettes a month, plaintiff has not shown that he was exposed to all of the smoke generated by

those one million cigarettes while he was housed in the C Cell House Unit.  Further, plaintiff

---

[44]*See Fitzgerald v. Corrections Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005) (quoting *Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990)) ("We have long held that 'conclusory allegations without specific supporting facts have no probative value.'") and (quoting *Morgan v. Willingham*, 424 F.2d 200, 201 (10th Cir. 1970)) ("[S]ummary judgment cannot rest on purely conclusory statements either in pleading or affidavit form.").

[45](Doc. 82 at 10.)

[46](Doc. 76, Ex. 13 at 3.)

provides no evidence that the ventilation system at USP Leavenworth was inadequate. Defendants have put forth evidence showing that USP Leavenworth meets ACA standards for air ventilation in inmate housing units, and plaintiff offers no evidence to controvert this fact outside of his own speculation.[47]

As another example, when defendants served plaintiff with a request for production of documents, defendants asked plaintiff to produce a copy of any and all documents which support his claim that he was exposed to unreasonably high levels of ETS.[48]  Plaintiff responded that "[a]ll of the documents that support [his] claim . . . can be easily verified by court order to subpoena all the purchase [sic] and sell [sic] of any tobacco products at [the] commissary unit between the time in question and also by subpoena [of] the blueprints for [the] ventilation system at USP Leavenworth and also by subpoena [of] the security camera tape at USP Leavenworth."[49]  Yet plaintiff never sought these documents or evidence from defendants through the scheduled discovery process,[50] and therefore, he has not presented this evidence to the Court for its

---

[47]"'To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.'" *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).

[48](Doc. 76, Ex. 14 at 4.)

[49](*Id.* at 5.)

[50]Plaintiff did apply to this Court for an order compelling defendants to produce certain documents and information (Doc. 77), almost two months after the discovery deadline had expired.  The Court construed plaintiff's motion as a request to reopen discovery, and denied plaintiff's request finding that he failed to make the requisite showing.  (Doc. 81.)  The Court further determined that to the extent the motion could be construed as a motion to compel discovery, plaintiff's request was denied because plaintiff had never served any discovery requests upon defendants.  In his response, plaintiff states that he "relied on the defendants to obtain documents to prove his claims but the defendant's [sic] refuse to provide this requested material."  (Doc. 82 at 11.)  Plaintiff's reliance is misplaced for two reasons.  First, because plaintiff never served defendants with any discovery requests, defendants were under no obligation to provide plaintiff with these documents.  Second, defendants, as the moving party for summary judgment, have the burden of putting forth facts to show there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once this burden is met, the burden shifts to plaintiff, as the nonmovant, to set forth specific facts from which a reasonable jury could find for plaintiff.  *Celotex*, 477 U.S. at 325.  Plaintiff's *pro se*

consideration on this summary judgment motion.  Further, plaintiff could have provided

evidence of the levels of ETS through his own sworn statements specifically describing the

conditions at USP Leavenworth.  But plaintiff has failed to provided sufficient evidence in such

a manner.  For instance, plaintiff has not listed the names of the inmates with which he was

housed at the prison, whether those inmates were smokers or nonsmokers, or how much those

inmates smoked while in a closed cell with plaintiff.  Plaintiff's broad, conclusory allegations

regarding the level of ETS to which he was exposed are not sufficient evidence to support a

claim.  Therefore, because as plaintiff even admits, he has not provided evidence that he was

exposed to unreasonably high levels of ETS, plaintiff cannot satisfy the objective prong of the

two-part test.

### B.    Deliberate Indifference

Even if plaintiff could show that he was exposed to unreasonably high levels of ETS at

USP Leavenworth, he fails to provide evidence that defendants were deliberately indifferent to

the hazards of exposing plaintiff to ETS.  "Deliberate indifference has objective and subjective

components."[51]  To meet the objective component of the deliberate indifference test, the harm

suffered must be "'sufficiently serious' to implicate the Cruel and Unusual Punishment

---

status does not relieve him of this burden.  The Tenth Circuit has stated that "[t]he relaxed treatment to which *pro se*
cases are entitled does not excuse the requirement for production of evidence."  *Cooper v. Davies*, 35 F.3d 574, 1994
WL 454532, at *1 (10th Cir. Aug. 17, 1994) (unpublished table opinion).  Thus, it is plaintiff's obligation, not
defendants', to provide the Court with this evidence to defeat defendants' summary judgment.  Further, to the extent
plaintiff contends that defendants have acted unethically or wrongfully by not providing these documents to plaintiff,
the Court dismisses such complaints because there is no evidence to support them.

[51]*Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (citing *Kikumura v. Osagie*, 461 F.3d 1269,
1291 (10th Cir. 2006)).

Clause."[52]  "To prevail on the subjective component, the prisoner must show that the defendants 'knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.'"[53]

Upon viewing the evidence in the light most favorable to plaintiff, he has not shown that the harm was sufficiently serious that it violated the Eighth Amendment as required by the objective component.  While plaintiff complains that he was housed with smoking inmates, he offers no evidence of an objectively serious medical need for defendants to have placed him in smoke free housing other than his allegations that he is a chronic asthma sufferer and cardiac patient.  However, defendants have provided evidence that there were no clinical indications that such a recommendation was medically necessary.  Defendant's peak low levels and his oxygen saturation levels remained at normal levels without significant changes throughout his incarceration at USP Leavenworth.  Additionally, plaintiff's health conditions have remained relatively stable during his entire incarceration, and therefore, there is no evidence clinically indicating that plaintiff's asthma, cardiac or diabetic conditions were caused or aggravated by ETS.

Further, plaintiff has failed to show that defendants knew of the risk of harm and that defendants disregarded that risk as required by the subjective component.  While plaintiff claims that "[e]ach of the defendants knew of [his] asthma and heart conditions and that their practice of forcing him to breathe second hand tobacco smoke was causing an excessive risk to [his] health

---

[52]*Id.* (citing *Kikumura*, 461 F.3d at 1291).

[53]*Id.* (quoting *Kikumura*, 461 F.3d at 1293); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

and safety,"[54] he provides no evidence of this other than his conclusory allegations which are

insufficient to survive summary judgment.[55]   Additionally, plaintiff has not shown that

defendants disregarded a risk of harm.  While plaintiff alleges that defendants were deliberately

indifferent to the risk of exposing plaintiff to ETS, the record contradicts his assertion.  When the

C Cell House Units were required to accommodate excess prisoners due to a renovation project,

defendants implemented a limited smoking policy.  Under that policy, inmates were permitted to

smoke only in their individual cells and only with the cell doors shut.  The Supreme Court has

stated that "the adoption of [a] smoking policy . . . bear[s] heavily on the inquiry into deliberate

indifference."[56]  Unit Manager Bennett posted a memorandum to the inmate population advising

of the implementation of this smoking policy and warning that violation of the policy would

result in discipline, such as the removal of phone, commissary, and visiting privileges for up to

90 days.  During this time period, Unit Manager Bennett testifies that he strictly enforced the

smoking policy, and he worked to ensure that the nonsmoking inmates were placed with a

nonsmoking roommate.  Plaintiff made complaints to Unit Manager Bennett regarding ETS, and

Unit Manager Bennett states that he attempted to work with plaintiff to ensure that he was not

placed with a smoking roommate, to identify and discipline inmates smoking in unauthorized

areas, and to limit the impact of the unit temporarily being designated with limited smoking

areas.  This evidence does not show that defendants were deliberately indifferent to the risk of

---

[54](Doc. 82 at 13.)

[55]*See Bisbee v. Bey*, 39 F.3d 1096, 1100 (10th Cir. 1994) (quoting *Pueblo Neighborhood Health Ctrs, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988)) ("'[P]laintiffs cannot rely on conclusory allegations; they must produce some specific factual support for their claim . . . .'"); *see also supra* n.44.

[56]*Helling v. McKinney*, 509 U.S. 25, 36 (1993).

harm of ETS, but rather it demonstrates that defendants implemented and enforced a smoking policy in an attempt to limit ETS exposure and that defendants were willing to accommodate nonsmoking inmates who did not want to be exposed to ETS.

During the relevant time period, plaintiff filed grievances with prison officials regarding his exposure to ETS that were denied because, as prison officials determined, the limited smoking policy did not violate the BOP policy that allows the Warden to designate smoking areas.  Further, these grievance denials note that the prison was willing to make accommodations to separately house smoking and nonsmoking inmates.  Additionally, Warden Connor denied plaintiff's complaints after finding no evidence to support his complaint.  In an interview, plaintiff told his unit manager that his cell mate did not smoke in the cell, and the cell mate was advised by prison officials that he could not smoke in the cell.  The record shows that the prison addressed plaintiff's grievances and worked with plaintiff to ensure he was not housed with a smoking inmate, and plaintiff has failed to put forth any evidence to controvert these facts. Therefore, the Court concludes that plaintiff cannot satisfy the subjective prong of the two-part test as required by *Helling v. McKinney*[57] because he has not shown that defendants were deliberately indifferent to the hazards of exposing plaintiff to ETS.

## V.    Conclusion

Plaintiff has failed to show that defendants' conduct violated the Eighth Amendment because the record lacks sufficient evidence to support plaintiff's claim that he was exposed to unreasonably high levels of ETS or that defendants were deliberately indifferent to the hazards

---

[57]509 U.S. 25 (1993).

of exposing plaintiff to ETS.  Therefore, the Court need not proceed further on the qualified

immunity issue.[58]  Because there is no evidence that defendants violated plaintiff's constitutional

rights, defendants are entitled to summary judgment based on qualified immunity.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Motion for

Summary Judgment (Doc. 75) is **GRANTED**.

**IT IS FURTHER ORDERED BY THE COURT** that defendants' Motion to Strike

Surreply (Doc. 85) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this  1st  day of February 2007.

 S/ Julie A. Robinson_____

Julie A. Robinson
United States District Judge

---

[58]*See Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996) (declining to address whether plaintiff had asserted a violation of a clearly established constitutional right after concluding that no constitutional right was violated).